**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. DOUGLAS SCHOTTENSTEIN, M.D.,
THOMPSON REAL ESTATE, LLC, and
SCHOTTENSTEIN PAIN AND NEURO, PLLC
D/B/A NY SPINE MEDICINE.

     *Plaintiffs,*

  v.

DEREK LEE and PEARL CHAN

     *Defendants.*

**COMPLAINT**
**WITH JURY DEMAND**

Dr. Douglas Schottenstein, M.D., Thompson Real Estate, LLC., and Schottenstein Pain and Neuro, PLLC d/b/a NY Spine Medicine, Plaintiffs herein, by their attorneys, allege and complain of defendants Derek Lee and Pearl Chan as follows:

## NATURE OF THE ACTION

1.  Dr. Douglas Schottenstein, M.D., Thompson Real Estate, LLC., and Schottenstein Pain and Neuro, PLLC d/b/a NY Spine Medicine (collectively "Plaintiffs") are victims of a sophisticated and sinister criminal enterprise orchestrated by former employees Derek Lee ("Lee") and Pearl Chan ("Chan") (collectively "Defendants").

2.  Dr. Schottenstein is the owner of Schottenstein Pain & Neuro, PLLC d/b/a NY Spine Medicine ("Medical Practice"), a highly acclaimed pain management practice.

3.  Dr. Schottenstein is also the owner of Thompson Real Estate, LLC, which owns his residence.

4.  Defendants were at one time employed by the Medical Practice, with Chan serving as office manager and Lee serving as a medical assistant.

5.      Defendants conspired over the course of several years to steal millions of dollars from Plaintiffs by means of bank fraud, wire fraud, identity theft and credit card fraud, computer fraud and hacking, criminal impersonation, and unauthorized practice of law.

6.      As set forth herein and as reported to the authorities, Dr. Schottenstein also alleges that Chan poisoned him by causing him to ingest anti-freeze, leading to Dr. Schottenstein's hospitalization for kidney failure.

7.      Plaintiffs bring claims against Defendants for violations of Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 *et seq*., fraud, conversion, tortious interference with contract, battery, conspiracies to commit fraud and tort, and intention infliction of emotional distress.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332.  The Plaintiffs are citizens of New York state and Lee and Chan are citizens of Texas.

9.      The amount in controversy exceeds $75,000.

10.     The Court also has jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

11.     Venue is proper in this District because Plaintiffs reside in this District, and a substantial part of the events and occurrences underlying this litigation occurred within this District.

## PARTIES

12.     Dr. Douglas Schottenstein, M.D. is a natural person and citizen of New York residing in New York, New York.

13.     Thompson Real Estate, LLC., is a domestic limited liability company formed and based in New York owned by Dr. Schottenstein.  Thompson Real Estate LLC owns Dr. Schottenstein's residence.

14.     Schottenstein Pain and Neuro, PLLC., d/b/a NY Spine Medicine is a professional limited liability company formed and based in New York owned by Dr. Schottenstein.

15.     Defendant Derek Lee is a resident of San Antonio, Texas.  Derek Lee is a former medical assistant for the Medical Practice.

16.     Defendant Pearl Chan, is a resident of San Antonio, Texas.  Pearl Chan is a former office manager for Medical Practice.

## **FACTS**

17.     On or about July 2013, Dr. Schottenstein hired Chan to be an office manager of his Medical Practice.

18.     Sometime after his hiring of Chan in 2013, Dr. Schottenstein hired Lee, for the role of medical assistant at the Medical Practice.

19.     Toward the end of 2018 or early 2019, Lee's employment with the Medical Practice ended, however, he continued to work on various tasks as an independent contractor for the Medical Practice until 2020.

20.     Together, Chan and Lee, among others yet to be identified, conspired to engage in a pattern of racketeering activity as described further below.

21.     Chan's employment with the Medical Practice was terminated in December 2020.

22.     Chan gained access to Plaintiffs finances, including, bank accounts and credit cards.

23.     In late December 2020, Chan installed Refog and Remote PC on Dr. Schottenstein's computer without his permission or knowledge (the "Refog Scheme").  Remote PC allowed Chan to log on to the computer remotely.  Refog is a program that allowed Chan to capture and monitor the keystrokes that Dr. Schottenstein entered on that computer.

24.     Chan installed these programs in furtherance of the racketeering enterprise and criminal scheme.

25.     The Refog Scheme involves, *inter alia*, unauthorized wires, account transfers and credit card charges, creation of fake vendors and fake vendor emails, purposeful mishandling of company checks and other serious criminal misconduct.

## WIRE FRAUD – THOMPSON REAL ESTATE, LLC ACCOUNT

26.     Some years ago, Dr. Schottenstein opened a checking account for Thompson Real Estate, LLC at a Citibank branch in New York, New York (the "Thompson Account").

27.     At all relevant times, Dr. Schottenstein, and Cara Camden were the only persons authorized to have access to the Thompson Real Estate, LLC account.

28.     The Thompson Account was used by Dr. Schottenstein to pay the mortgage of his residence in New York City.

29.     On or about February 2020, Defendants gained access to the Thompson Account without the knowledge, consent, or prior authorization of Dr. Schottenstein.

30.     Lee and Chan also gained access to Dr. Schottenstein's account at Iberia Bank ("Iberia Account").

31.     As part of the wire fraud scheme, Lee made several calls to Citibank impersonating Dr. Schottenstein.

32.     On information and belief, Chan was feeding security information to Lee while he was on the telephone to assist with the impersonation of Dr. Schottenstein and the execution of fraudulent wire transfers.

33.     The following are excerpts of Lee's calls to Citibank:

34.     Account representative "Emily" asked Lee for a debit card number. Lee responded, "I don't have the debit card on me."  Lee suggested providing the security word and the last four digits of Dr. Schottenstein's social security number rather than the debit card number. Emily acquiesced.

35.     Account representative "Ishmael" suggested sending a text message to Lee to verify the transaction. In response, Lee stated, "That's my office number, it is not going to work."

36.     Ishmael requested the date of birth of the signer of the account, Cara Camden. Lee provided the incorrect date of birth for Ms. Camden.

37.     Account representative "Avam" requested Cara Camden's date of birth.  Lee responded, "Cara's date of birth? Hold on let me see it."  Avam advised Lee to call back with the correct information.

38.     Account representative "Jane" at Citibank stated, "Can you please verify your full name and your card number?"  Lee responded, "I don't have the card number, but I do have the account number."  Jane allowed Lee to provide the account number.

39.     Lee advised the Citibank representative "Yeah, for some reason I had changed my password, couldn't log back in and I just happened to call earlier this morning to reset the password and I'm still waiting for that."  The Citibank representative verified the transaction.

40.     Account representative "Ian" requested a token, to which Lee stated, "I do not have a token on me, no."

41.     Account representative "Chial" stated, "if [Citibank] needs anything from you, you will be receiving a call back…."  Lee admitted, "if they call me back, they are not going to reach me, it is going to reach the office phone, which goes to an answering service, not me." Following this exchange, Chial allowed Lee to provide an unverified number for Citibank to reach Lee.

42.     A Citibank representative advised Lee, "I do see here that due to maximum bad passwords, sir, I'm afraid that your access has been deactivated, and that's why you're not getting the pin when you do the forgot password online.  So we have to reactivate you first so that we, so that you are able to reset the password."

43.     Lee responded suspiciously, "Okay.  What email do you have on file there?  For me to check … so, I don't have to wait for an email from you…."

44.     The Citibank representative asked Lee to verify the high school he attended. Confused, Lee responded with the following question: "In terms of St. Columbus?"  The Citibank representative did not answer Lee's question.  Instead, the Citibank representative stated, "whatever you placed on the account." Lee stated he would need additional time to answer that question but then responded, "I know that Bexley High School, I'm not sure about the other Kentucky one."  Following this highly suspicious answer, Citibank authorized a wire transfer of $429,741.11.

45.     On February 20, 2020, a wire transfer of $429,741.11 was made from the Citibank account to "Derek Lee JPMorgan Chase Bank, NA" without Dr. Schottenstein's knowledge, consent or approval.

46.     On February 27, 2020, $249,000 was transferred from the Iberia Account to the Thompson Account without Dr. Schottenstein's knowledge, consent or approval.

47.     On March 20, 2020, $319,057.63, was transferred from the Thompson Account to "Derek Lee JPMorgan Chase Bank, NA" without Dr. Schottenstein's knowledge, consent, or approval.

48.     On August 28, 2020, Lee deposited $100,000 into the Iberia Account without Dr. Schottenstein's knowledge, consent, or approval.

49.     The unauthorized deposits were presumably made to obscure the fact that Lee and Chan drained the Thompson Account of approximately $748,848.

50.     Chan and Lee made all these wire transfers.

51.     On September 10, 2020, a check from the Iberia Account for $118,000.00 was made out to Dr. Schottenstein. On its face, it appears to be signed by Dr. Schottenstein. However, he has no memory of writing that check and no record of depositing it in any of his accounts.

52.     Upon information and belief, Lee and Chan forged a check, impersonated Dr. Schottenstein and absconded with the $118,000.00.

**PATTERN OF RACKETEERING**

53.     The funds used to effectuate the fraudulent wire transfers to Lee were procured by shuffling money between Dr. Schottenstein's various personal and business bank accounts without his authorization in an attempt to avoid detection.

54.     In order to conceal the fraud on the Thompson Account, which was used to pay the mortgage on Dr. Schottenstein's residence, Defendants intercepted and/or redirected the monthly mortgage payments.

55.     As a result of Lee and Chan's fraudulent scheme, Dr. Schottenstein was unaware that his Townhouse fell into foreclosure.

56.     Lee and Chan, having intercepted Dr. Schottenstein's mortgage payments, concocted another scheme whereby Chan criminally impersonated an attorney of Dr. Schottenstein's via email and engaged in the unauthorized practice of law purporting to help Dr. Schottenstein prevent foreclosure on his townhome.

57.     Chan, under the fraudulent guise of a lawyer named Tracy Pearson (who is an actual attorney) sent multiple emails to Dr. Schottenstein, which were courtesy copied to Chan, falsely telling him and leading him to believe his legal problems, including the townhouse foreclosure, were of no concern and being capably handled by a licensed attorney.

58.     On February 12, 2020, Chan, under the fraudulent guise of Attorney Pearson, sent Dr. Schottenstein an email including the following statement:  "hi doug, this is tracy, the attorney helping you on a few things, everything is going perfectly and as planned."

59.     On February 14, 2020, Chan, under the fraudulent guise of Attorney Pearson, sent Dr. Schottenstein an email in response to his concerns about foreclosure stating: "No risk of losing the house, and I'm wrapping up the two issues you asked [Chan] to have me look into and deal with yesterday."

60.     On March 26, 2020, Chan, again under the fraudulent guise of Attorney Pearson, sent Dr. Schottenstein an email with the following language:

> "i spoke to [Chan] and am aware that you received an inaccurate bill from cenlar today but please don't worry because it is erroneous since they haven't been in charge of the loan for almost a year. i have been in constant communication with cenlar and gallo. there is no foreclosure on 168 thompson and cenlar does not have the updated information because gallo is in charge of the loan at this time and has been for several months. gallo's office is working on this asap so that cenlar reflects the appropriate zero balance owed. due to corona outbreak, there's

been more delays than we anticipated, but there is definitely no foreclosure on your townhouse and you do not owe any monies at this time."

61.     On April 21, 2020, Chan again under the guise of Tracey Pearson sent Dr.

Schottenstein an email:

"I am aware of the cenlar document re: homeowner insurance that states you owe cenlar 20k+, this is all inaccurate and another common error cenlar has been making, which we have fixed with gallo because he is still in charge of the loan/mortgage/property, and it will take time for cenlar to have the accurate information reflected"

62.     Dr. Schottenstein reasonably relied on these representations assuming them to be

from an attorney.

63.     In fact, these false representations were created by Chan.

64.     Dr. Schottenstein's townhouse was in foreclosure.

65.     As a result of Dr. Schottenstein's reliance on Chan's fraudulent emails, his

townhouse fell into foreclosure forcing Dr. Schottenstein to expend additional funds to prevent

foreclosure.

66.     Additionally, the fraudulent emails from Tracey Pearson prevented Dr.

Schottenstein from discovering Chan and Lee's theft of funds from the Thompson Account at an

earlier date.

67.     In furtherance of Defendants' racketeering, Defendants also criminally

impersonated an accountant for Dr. Schottenstein named "Adam Dussberg" in emails advising

Dr. Schottenstein that his taxes were in order and that there was "nothing owed".  This, too, was

false.

68.     In furtherance of the fraud, Lee and Chan created a fake billing company. Instead

of sending the Medical Practices' invoices to an actual billing company who would invoice the

patients' insurers and seek reimbursement, Chan created a fake billing company, and represented

to Dr. Schottenstein that the invoices were being handled properly, when in fact they were not provided to insurers.

69.     On or about December 2, 2020, to his shock and horror, Dr. Schottenstein determined he was corresponding with a "sock puppet" lawyer and accountant.

70.     Shortly thereafter, Dr. Schottenstein, suspicious but uncertain whether his office manager Chan was behind the scheme, asked Chan to meet with him, whereby he stated his suspicions. Chan had no response.

71.     On or about January 22, 2020, Dr. Schottenstein, who was otherwise in good health, was admitted to the hospital for kidney failure.

72.     On or about January 22, 2020, Dr. Schottensteins dog, who was otherwise in good health, also suffered kidney failure.

73.     Dr. Schottenstein remained in the hospital until his discharge on January 31, 2020.

74.     After meeting with Chan in late 2020 regarding the false lawyer and accountant emails, Dr. Schottenstein found anti-freeze in his office.  The bottle was open and was missing fluid.

75.     Ingestion of anti-freeze can cause kidney failure.

76.     At this time, Dr. Schottenstein realized there had been an attempt to poison him and his dog and in January 2020, and confronted Chan.

77.     Chan did not deny her involvement in the criminal conduct and remained silent after Dr. Schottenstein confronted her.

78.     Dr. Schottenstein fired Chan at that time.

79.     In February of 2021, Dr. Schottenstein filed a police report regarding Lee and Chan's criminal conduct.

80.     As of the date hereof, the full extent of Defendants' fraud and racketeering enterprise is still unknown to Dr. Schottenstein and is being investigated.

## AMEX CREDIT CARD FRAUD

81.     Beginning at least in 2016, Lee and Chan began charging a vast array of their personal expenses totaling hundreds of thousands of dollars to the Medical Practice's American Express account without Dr. Schottenstein's authorization.

82.     On January 7, 2020, Lee and Chan began frequently making unauthorized charges to Dr. Schottenstein's Medical Practice's American Express ("AMEX") card.

83.     One aspect of the fraud was using Medical Practice's AMEX business card to rack up charges on a phony Uber account controlled by Chan and Lee.

84.     The AMEX payments to the phony Uber account went to Lee and Chan.

85.     In 2020 alone, these unauthorized charges on the AMEX business card included at least $68,941 in fraudulent charges including Uber rides, charges for five-star hotel stays, and expensive meals.

86.     When Dr. Schottenstein asked Chan why his AMEX business card statements were so high, Chan replied by telling Dr. Schottenstein the charges were fraudulent charges incurred by an unknown party and the "police" were investigating them.

87.     The charges on the AMEX business card were indeed fraudulent but were incurred by Defendants and no police investigation was requested nor did any investigation take place.

**FIRST CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(Chan and Lee, Defendants)**

88.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs

and incorporates them with the same force and effect as if set forth specifically herein.

           I.     **The Applicable Statutes.**

89.     Each Plaintiff is a person as defined in 18 U.S.C. § 1961(3) and 1964(c).

90.     Defendants Lee and Chan are persons as defined in 18 U.S.C.§ 1961(3) and

1964(c).

91.     Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or

associated with an enterprise engaged in, or the activities of which affect, interstate or foreign

commerce to conduct or participate directly or indirectly in the conduct of such enterprise's

affairs for a pattern of racketeering activity or collection of unlawful debt." And, under 18 U.S.C.

§ 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions,

including section 1962(c).

92.     Federal RICO, specifically 18 U.S.C. § 1964(c), creates a private right of action

for any person injured in his business or property by reason of violation of § 1962 and provides

for threefold the damages sustained upon recovery for the cost of suit including reasonable

attorney fees.

           II.     **The Enterprise.**

           **Legal Entity Enterprise**

93.     The Enterprise is Schottenstein Pain & Neuro, PLLC, a legal entity as defined in

18 U.S.C. § 1961(4).  Defendants Lee and Chan worked as Office Managers for this legal entity

for a number of years and thus conducted and managed the affairs of the entity. The activities of

the Enterprise affected interstate commerce as it provided services to clients, who are located in

other states and is a business which used goods and services which travel in interstate commerce. Although Lee was not employed by the entity at the time of the year 2020 frauds, he had participated for years in the AMEX access device fraud and remained a close associate of Chan.

**Association in Fact Enterprise**

94.     The Enterprise is alternatively an association in fact consisting of Lee and Chan and any other persons not yet known which associated with them. Lee and Chan functioned for the purpose of defrauding Plaintiffs and enriching the Enterprise's members and associates.  The purpose of the Enterprise was to defraud Plaintiffs of monies and properties through wire fraud, mail fraud, identification fraud through the impersonation of attorneys, and fraudulent activity in connection with access devices (AMEX Fraud).  The monies obtained by these various schemes were used for Defendants' personal enrichment.

95.     Lee and Chan conducted the affairs of the Enterprise. The Enterprise, an association in fact between Lee, Chan, and others yet unknown, operated as an ongoing organization separate and distinct from each individual Defendant.  The Enterprise, an association in fact of individuals, has a structure separate and apart from the pattern of racketeering activity in which Defendants engage.

96.     At all times relevant to this Complaint, Lee and Chan, members and associates of the Enterprise, an association in fact enterprise, functioned together as a continuing unit, with a common purpose for their own economic benefit and personal gain.  Lee and Chan each participated in the management and operation of the Enterprise, as further described below. The Enterprise had longevity sufficient to permit the RICO Defendants pursue the Enterprise's purpose.

97.     The activities of the association in fact Enterprise also affected interstate commerce as it provided services to clients, who are located in other states and is a business which used goods and services which travel in interstate commerce.  The Enterprise also affected interstate commerce based on Defendants' unlawfully obtaining, transmitting, billing and collecting monies through use of interstate wirings and access device fraud, in furtherance of the racketeering scheme as alleged in the Complaint.

**The Racketeering Violations**

98.     From on or about the year 2016, and continuing up through the year 2020, the RICO Defendants, persons associated with or employed by the Enterprise, did knowingly and unlawfully conduct, or participate, directly or indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

**Racketeering Activity -Definition of Crimes**

99.     Over the course of at least four (4) years, Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity at the effective date of RICO and also within 10 years of each individual act. Defendants' actions violated the federal wire fraud statutes 18 U.S.C. § 1343; 18 U.S.C. § 1029(a)(5) (knowingly and with intent to defraud effects transaction with one or more access devices issued to another person); 18 U.S.C. § 1028(a)(7) use of identification of another person with intent to commit unlawful activity which constitutes a felony;  and attempted murder in violation of New York state law 125.25 (murder in the second degree), all predicate acts for purposes of racketeering, resulting in the defrauding of Plaintiffs well over one million dollars.

100.    <u>Wire Fraud in violation of 18 U.S.C. § 1343</u> - Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

**Fraud in Connection With Access Devices**

101.    Section 1029(a)(2) of 18 U.S.C. makes it unlawful to "knowingly and with intent to defraud [,] traffic[ ] in or use [ ] one or more unauthorized access devices during any one-year period, and by such conduct obtain [ ] anything of value aggregating $1,000 or more during that period." The term "access device" includes credit cards, *see* 18 U.S.C. § 1029(e)(1), and an "unauthorized access device" is defined as "any access device that is lost, stolen, expired, revoked, canceled, *or obtained with intent to defraud," id.* § 1029(e)(3) (emphasis added). Section 1029(a)(5) punishes a person who knowingly and with intent to defraud effects transactions with one or more access devices issued to another person.

102.    <u>Knowing Use Without Lawful Authority of Means of Identification of Another</u> <u>person With Intent to Commit a Felony</u>- 18 U.S.C. § 1028(a)(7); knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable state or local law.

103.    <u>Attempt to commit Murder in the Second Degree- NYS section 125.25</u> - A person is guilty of murder in the second degree when: "With intent to cause the death of another person, he causes the death of such person or of a third person."  Attempted murder in

violation of New York state law is a predicate under 18 U.S.C. 1961(1)(A), an act or threat involving murder.

**Predicate Acts**

- Wire Fraud - In furtherance of their schemes to defraud, and with the purpose of executing his scheme to defraud, Lee and Chan herein, made intentional misrepresentations and omissions which include, but are not limited to, the following:

104.    On February 20, 2020, Lee and Chan, working together, caused a wire transfer of $429,741.11 from the Thompson Account to "Derek Lee JP Morgan Chase Bank N.A." without Dr. Schottenstein's knowledge, consent or approval.

105.    On February 27, 2020, Lee and Chan, working together, caused a wire transfer of $249,000 from the Iberia Account to the Thompson account (controlled by Defendant) without Dr. Schottenstein's knowledge, consent or approval.

106.    On March 20, 2020, Lee and Chan, working together, caused a wire transfer of $319,057.63. from the Thompson Account to "Derek Lee JP Morgan Chase Bank N.A." without Dr. Schottenstein's knowledge, consent or approval.

107.    On April 23, 2020, Lee and Chan, working together, caused a wire transfer of $249,000 from the Thompson Account to the Iberia Account without Dr. Schottenstein's knowledge, consent or approval.

108.    These unauthorized deposits and withdrawals were to obscure the fact that Lee and Chan had drained the Thompson Account of approximately $748,848, payable to Lee, without Dr. Schottenstein's knowledge, consent or approval.

109.   Defendants Lee and Chan also forged a check in the amount of $118,000 from the Iberia Account made out to Dr. Schottenstein, which monies were used by Lee and Chan.

- Identification Fraud, Section 1028(a)(7) (using the means of another person with intent to commit or aid and abet any unlawful activity in violation of federal law, e.g., wire fraud).

110.   As set forth above, Lee repeatedly impersonated Dr. Schottenstein on calls with Citibank in order to effective the wire transfers.

111.   Defendants, having intercepted Dr. Schottenstein's mortgage payments, concocted another scheme whereby Chan criminally impersonated an attorney via email and engaged in the unauthorized practice of law purporting to help Dr. Schottenstein prevent foreclosure.  Chan, under the fraudulent guise of a lawyer named Tracy Pearson (who is a real attorney) sent multiple emails to Dr. Schottenstein (which were cc'd to Chan) falsely telling him and leading him to believe his legal problems, including the foreclosure, were of no concern and being capably handled.

112.   From February 2020 to March of 2020, Chan sent e-mails, which are wires in interstate commerce and thus the e-mails were section 1343 predicate activity to Dr. Schottenstein which were materially false.

113.   In furtherance of Defendants' racketeering, Defendants also criminally impersonated an accountant for Dr. Schottenstein named "Adam Dussberg" in emails advising Dr. Schottenstein that his taxes were in order and that there was "nothing owed".  This, too, was false, and constitutes both a violation of section 1028(a)(7), and the e-mail wire fraud in violation of section 1343.  Defendants Chan and/or Lee impersonated other professionals,

created fake vendors and sham entities to steal money from Dr. Schottenstein by means of deception.

- <u>Attempted Murder in Violation of New York State Law</u>

114.    As previously described, Chan caused Dr. Schottenstein (and his dog) to fall ill with kidney problems, which was suspected to be poisoning by anti-freeze, which actions when confronted by Plaintiffs, Chan did not deny her involvement.  The matter is currently under police investigation.

- Fraud In Connection Illegal Use of Plaintiffs' Access Device (AMEX Credit Card Fraud) - Section 1029(a)(2) and/or (a)(7).

115.    As described previously, beginning at or around October 2016, and continuing through year December 2020 Lee and Chan charged a wide variety of expenses to Plaintiffs' AMEX account without his authorization.  As part of this fraud, Defendants set up phony Uber accounts and began charging the Medical Practice's AMEX business card to these Uber accounts when in fact Lee and Chan were receiving the payments.

116.    These unauthorized charges on the AMEX business card included at least $68,941.01 fraudulent charges in 2020 alone including charges for Uber rides, stays at five-star hotels and expensive restaurants.  When Dr. Schottenstein asked Chan why his AMEX business card statements were so high, Chan replied by telling Dr. Schottenstein the charges were fraudulent charges incurred by an unknown party and that the "police" were investigating.  Dr. Schottenstein relied on these false claims that the fraudulent charges were being investigated, and as a result did not take further action until 2021 causing him additional financial injury.

**Pattern of Racketeering Activity**

117.    Plaintiffs allege that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of defrauding Plaintiffs of millions of dollars, all for the personal enrichment of the Defendants.

118.    Plaintiffs alleges that the continuity of the pattern of racketeering activity constitutes closed-ended continuity as there were a substantial number of violative activities, connected through multiple schemes, which occurred on a continuous basis over a substantial period of time, *i.e.*, from about October 2016 through August 2020.

119.    Plaintiffs alleges that the pattern of racketeering activity is shown by the threat of continued activity as Defendants engaged in such serious violations as attempted murder to cover their frauds and thus Lee and Chan remain a threat to others and their racketeering activity meets the open-ended continuity test.

**Injury**

120.    As a direct and proximate result of the Defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property as set forth more fully above.

121.    As a result, Plaintiffs are damaged in an amount to be determined at trial.

<u>SECOND CAUSE OF ACTION</u>
(Federal Civil RICO Conspiracy – 18 U.S.C. § 1962(d))
**Against Defendants Lee and Chan**

122.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

**The Conspiracy Violation**

123.    Plaintiffs allege that commencing in early 2016, the RICO Defendants described above conspired to violate section 1962(c), i.e., each agreed that a co-conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of acts indictable under 18 U.S.C. §§ 1343, 18 U.S.C. § 1028(a)(7); 1029(a)(2) and (a)(7); and attempted murder, as more fully described in the First Cause of Action. Plaintiffs allege that the conspiratorial objective of that mutual agreement was intended to obtain Plaintiffs' interests in business and/or property, and that such conspiratorial conduct violates RICO §1962(d).

124.    Each RICO Conspiracy Defendant intended to further the schemes to defraud and commit violent crimes, which as described in Claim I were completed and satisfied by at least one substantive individual Defendant. As demonstrated in detail above, Chan and Lee have engaged in numerous predicate racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud Plaintiffs of money and other property interests.

125.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each Defendant not only agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but was aware that his ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

126.    As a result, Plaintiffs are damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Fraud)

127.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

128.    Chan's fraudulent statements to Plaintiffs hid Chan and Lee's theft of funds from the Thompson Account and the AMEX account and kept Dr. Schottenstein from discovering the theft earlier.

129.    In addition, Chan and Lee intentionally and knowingly pretended to be an attorney and falsely represented to Dr. Schottenstein that his townhouse was not in foreclosure.

130.    Dr. Schottenstein reasonably relied on those representations.

131.    As a direct result of those representations, Dr. Schottenstein was the victim of multiple large wire transfers and his townhouse fell into foreclosure, forcing him to expend additional funds to remove the townhouse from foreclosure proceedings.

132.    As a result of Chan and Lee's fraud, Plaintiffs are damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Conversion)

133.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

134.    Dr. Schottenstein was the exclusive owner of the Thompson Account and the Iberia Account.

135.    Lee and Chan interfered with Dr. Schottenstein's exclusive ownership of the Thompson Account and Iberia Account and his right to possession of the funds therein when they, having stolen his identity, gained access to those accounts, and made various transfers

including three transfers to an account controlled by Chan and Lee totaling approximately $748,848 in funds stolen from Dr. Schottenstein.

136.     Upon information and belief, Lee and Chan forged a check, impersonated Dr. Schottenstein and absconded with $118,000.00.

137.     In addition, in 2020 alone Lee and Chan interfered with Dr. Schottenstein's exclusive right to control the Medical Practice's AMEX card and used it for the purpose of purchasing over $68,941.01 in personal goods and services.

138.     As a result of Defendants' conversion, Plaintiffs are damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTON
### (Tortious Interference with Contract)

139.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

140.     Dr. Schottenstein had a valid contract for the mortgage on his town house.

141.     Lee and Chan knew Dr. Schottenstein had a mortgage on his town house.

142.     Lee and Chan conspired to interfere with that contract by diverting Dr. Schottenstein's mortgage payments causing Dr. Schottenstein to breach his mortgage agreement.

143.     As a result of Dr. Schottenstein's breach, he has had to pay additional funds to remove his town house from foreclosure.

144.     As a result of Defendants' interference, plaintiffs are damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Battery)

145.    Dr. Schottenstein repeats and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

146.    Chan contaminated Dr. Schottenstein's food or drink with antifreeze with the intent to kill him.

147.    As a result of Chan's action, Dr. Schottenstein ingested the poisoned food or drink and became seriously ill with kidney failure requiring dialysis and a two week stay in the hospital.

148.    As a result of Defendants' battery, Dr. Schottenstein is damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Conspiracy to Commit Fraud)

149.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

150.    Upon information and belief, Lee and Chan conspired together to engage in the fraud described above by using a sock puppet lawyer and sock puppet accountant to fool Dr. Schottenstein into believing his town house was not in foreclosure.

151.    Upon information and belief, Lee and Chan engaged in this conspiracy to commit fraud for the purpose of hiding their theft of not less than one million.

152.    As a result of Defendants' conversion, Plaintiffs are damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Conspiracy to Commit a Tort)

153.    Plaintiffs repeat and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

154.    Upon information and belief, Lee and Chan conspired to engage in a scheme to steal not less than one million dollars from Dr. Schottenstein.

155.    In furtherance of that scheme Lee and Chan conspired to hide their theft from Dr. Schottenstein by inventing a sock puppet lawyer and accountant to deceive Dr. Schottenstein into believing his town house was not going into foreclosure so that he would not notice the significant drawdowns in the Thompson Account.

156.    Lee and Chan conspired to take control of the Medical Practice's AMEX and charge $68,941 in unauthorized purchases for which Dr. Schottenstein is liable.

157.    Lee and Chan conspired to impersonate Dr. Schottenstein o calls with Citibank in order to Authorize fraudulent wire transfers.

158.    Finally, upon information and belief, Lee and Chan conspired to kill Dr. Schottenstein to conceal their theft.

159.    As a result of Lee and Chan's conversion, Plaintiffs are damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

160.    Dr. Schottenstein repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

161.    Lee and Chan's conduct in stealing not less than $748,848 from Dr. Schottenstein's bank account, costing him not less than $68,941 in AMEX charges (in 2020

alone), diverting his mortgage payments causing his town house to fall into foreclosure, creating a fake billing company, deceiving Dr. Schottenstein about the status of his mortgage and the state of his financial situation, and finally poisoning him and his dog was extreme or outrageous conduct.

162. Defendants engaged in this conduct either with the intent to or in disregard of the substantial possibility of causing Dr. Schottenstein emotional distress.

163. Dr. Schottenstein has endured emotional distress as a direct result of Chan and Lee's actions.

164. As a result of Chan and Lee's Intentional Infliction of Emotional Distress, Dr. Schottenstein is damaged in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs Dr. Douglas Schottenstein, M.D., Thompson Real Estate, LLC., and Schottenstein Pain and Neuro, PLLC d/b/a NY Spine Medicine seek judgment in their favor and against Defendants:

A. awarding Plaintiffs actual damages, treble damages, statutory damages, punitive damages, costs, and reasonable attorneys' fees;

B. interest calculated from the dates of the transfers;

C. Injunctive relief; and

D. such other and further relief as may be necessary, just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: February 11, 2022

<div style="margin-left: 40%;">

*/s/Daniel A. Schlanger*
Daniel A. Schlanger
Schlanger Law Group LLP
80 Broad Street, Suite 1301
New York, NY 10004
T: 212-500-6114
F: 646-612-7996
E: dschlanger@consumerprotection.net

*/s/ Richard Rosenthal*
Richard Bruce Rosenthal
Federal Bar No. rb1834
545 E. Jericho Turnpike
Huntington Station, NY 11746
Tel: (631) 629-8111
Cell: (516) 319-0816
Fax: (631) 691-8789
E: richard@thedoglawyer.com

*Counsel for Plaintiffs*

</div>