**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. DOUGLAS SCHOTTENSTEIN, M.D.,
THOMPSON REAL ESTATE, LLC, and
SCHOTTENSTEIN PAIN AND NEURO, PLLC
D/B/A NY SPINE MEDICINE.

                    *Plaintiffs,*
          v.

DEREK LEE, PEARL CHAN,
And JOHN AND JANE DOES 1-10,

                    *Defendants*.

**SECOND AMENDED COMPLAINT**
**WITH JURY DEMAND**

Civil Action No.: 22-cv-01197 (DLC)

Dr. Douglas Schottenstein, M.D., Thompson Real Estate, LLC., and Schottenstein Pain and Neuro, PLLC d/b/a NY Spine Medicine, Plaintiffs herein, by their attorneys, allege and complain of defendants Derek Lee and Pearl Chan as follows:

## NATURE OF THE ACTION

1.      Dr. Douglas Schottenstein, M.D., Thompson Real Estate, LLC., and Schottenstein Pain and Neuro, PLLC d/b/a NY Spine Medicine (collectively "Plaintiffs") are victims of a sophisticated and sinister criminal enterprise orchestrated by former employees Derek Lee ("Lee") and Pearl Chan ("Chan"), and John and Jane Does 1-10 (collectively "Defendants").

2.      Dr. Schottenstein is the owner of Schottenstein Pain & Neuro, PLLC d/b/a NY Spine Medicine ("Medical Practice" or "Medical Office"), a highly acclaimed pain management practice.

3.      Dr. Schottenstein is also the owner of Thompson Real Estate, LLC, which owns his residence.

1

4.      Defendants were at one time employed by the Medical Practice, with Chan
initially serving as a medical assistant and, ultimately, as office manager, and Lee serving
as a medical assistant.

5.      Defendants conspired over the course of several years to steal millions of dollars
from Plaintiffs by means of bank fraud, wire fraud, identity theft and credit card fraud, computer
fraud and hacking, criminal impersonation, and unauthorized practice of law.

6.      As set forth herein and as reported to the authorities, Dr. Schottenstein also
alleges that Chan and Lee poisoned him by causing him to ingest anti-freeze, leading to
Dr. Schottenstein's hospitalization for kidney failure.

7.      Plaintiffs bring claims against Defendants for violations of Racketeer Influenced
and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 *et seq*., fraud, conversion, tortious
interference with contract, battery, conspiracies to commit fraud and tort, and intentional
infliction of emotional distress.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction pursuant to 28 U.S.C. § 1332.  The Plaintiffs are
citizens of New York state and Lee and Chan are citizens of Texas.

9.      The amount in controversy exceeds $75,000.

10.      The Court also has jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

11.      Venue is proper in this District because Plaintiffs reside in this District, and a
substantial part of the events and occurrences underlying this litigation occurred within this
District.

## PARTIES

12.      Dr. Douglas Schottenstein, M.D. is a natural person and citizen of New York
residing in New York, New York.

13.     Thompson Real Estate, LLC., is a domestic limited liability company formed and based in New York owned by Dr. Schottenstein.  Thompson Real Estate LLC owns Dr. Schottenstein's residence.

14.     Schottenstein Pain and Neuro, PLLC., d/b/a NY Spine Medicine is a professional limited liability company formed and based in New York owned by Dr. Schottenstein.

15.     Defendant Derek Lee is a resident of San Antonio, Texas.  Derek Lee is a former medical assistant for the Medical Practice.

16.     Defendant Pearl Chan, is a resident of San Antonio, Texas.  Pearl Chan is a former medical assistant and, ultimately, the office manager for the Medical Practice.

17.     Upon information and belief, at all relevant times, Defendants John and Jane Does 1-10 are persons and/or business entities presently unknown, and who participated in the racketeering, fraud, conversion, tortious interference, conspiracies, and all other causes of action set forth at length below, or who received the proceeds of same, with their true names and identities being unknown to the Plaintiffs at the present time.

## FACTS

18.     In or about July 2013, Dr. Schottenstein hired Chan as a medical assistant for the Medical Practice. In late 2016, Chan was promoted to the position of office manager.

19.     Sometime after his promotion of Chan to office manager in late 2016, Dr. Schottenstein hired Lee, for the role of medical assistant at the Medical Practice.

20.     In or about July, 2019, Lee's employment with the Medical Practice was terminated, however, without Dr. Schottenstein's knowledge or authority, Chan kept Lee on the Medical Practice payroll resulting in Lee receiving unearned compensation and costing the Medical Practice significant other expenses.

21.     In addition, Lee worked on various tasks as an independent contractor at Dr.

Schottenstein's residence.

22.     Together, Chan and Lee, among others yet to be identified, conspired to engage in a pattern of racketeering activity as described further below.

23.     Chan's employment with the Medical Practice was terminated in December, 2020. At or about that time, Lee was also terminated from performing tasks at Dr. Schottenstein's residence.

24.     In the course of her employment by the Medical Practice, Chan gained access to Plaintiffs' finances, including bank accounts and the Medical Office American Express credit card. In or about December, 2020, Chan installed Refog and Remote PC on Dr. Schottenstein's computer without his permission or knowledge (the "Refog Scheme").  Remote PC allowed    Chan to log on to the computer remotely.  Refog is a program that allowed Chan to capture and monitor the keystrokes that Dr. Schottenstein entered on that computer.

25.     Chan installed these programs in furtherance of the racketeering enterprise and criminal scheme.

26.     The Refog Scheme involves, *inter alia*, unauthorized wires, account transfers and credit card charges, creation of fake vendors and fake vendor emails, purposeful mishandling of company checks and other serious criminal misconduct.

### WIRE FRAUD – THOMPSON REAL ESTATE, LLC ACCOUNT

27.     In late 2016, Dr. Schottenstein opened a checking account for Thompson Real Estate, LLC at a Citibank branch in New York, New York (the "Thompson Account").

28.     At all relevant times, Dr. Schottenstein, and Cara Camden were the only persons authorized to have access to the Thompson Real Estate, LLC account.

29.     The Thompson Account was used by Dr. Schottenstein solely to pay the mortgage

on his residence in New York City.

30.     In or about February 2020, Defendants gained access to the Thompson Account without the knowledge, consent, or prior authorization of Dr. Schottenstein.

31.     In or about this time, Lee and Chan also gained access to Dr. Schottenstein's account at Iberia Bank ("Iberia Account").

32.     As part of the wire fraud scheme, Lee with the direct assistance of Chan made several calls to Citibank impersonating Dr. Schottenstein.

33.     On information and belief, Chan was feeding security information to Lee while he was on the telephone to assist with the impersonation of Dr. Schottenstein and the execution of fraudulent wire transfers.

34.     The following are excerpts of Lee's calls to Citibank:

35.     Account representative "Emily" asked Lee for a debit card number. Lee responded, "I don't have the debit card on me."  Lee suggested providing the security word and the last four digits of Dr. Schottenstein's social security number rather than the debit card number. Emily acquiesced.

36.     Account representative "Ishmael" suggested sending a text message to Lee to verify the transaction. In response, Lee stated, "That's my office number, it is not going to work."

37.     Ishmael requested the date of birth of the signer of the account, Cara Camden. Lee provided the incorrect date of birth for Ms. Camden.

38.     Account representative "Avam" requested Cara Camden's date of birth.  Lee responded, "Cara's date of birth? Hold on let me see it."  Avam advised Lee to call back with the correct information.

39.     Account representative "Jane" at Citibank stated, "Can you please verify your full

name and your card number?"  Lee responded, "I don't have the card number, but I do have the account number."  Jane allowed Lee to provide the account number.

40.     Lee advised the Citibank representative "Yeah, for some reason I had changed my password, couldn't log back in and I just happened to call earlier this morning to reset the password and I'm still waiting for that."  The Citibank representative verified the transaction.

41.     Account representative "Ian" requested a token, to which Lee stated, "I do not have a token on me, no."

42.     Account representative "Chial" stated, "if [Citibank] needs anything from you, you will be receiving a call back…."  Lee admitted, "if they call me back, they are not going to reach me, it is going to reach the office phone, which goes to an answering service, not me."  Following this exchange, Chial allowed Lee to provide an unverified number for Citibank to reach Lee.

43.     A Citibank representative advised Lee, "I do see here that due to maximum bad passwords, sir, I'm afraid that your access has been deactivated, and that's why you're not getting the pin when you do the forgot password online.  So we have to reactivate you first so that we, so that you are able to reset the password."

44.     Lee responded suspiciously, "Okay.  What email do you have on file there?  For me to check … so, I don't have to wait for an email from you…."

45.     The Citibank representative asked Lee to verify the high school he attended.  Confused, Lee responded with the following question: "In terms of St. Columbus?"  The Citibank representative did not answer Lee's question.  Instead, the Citibank representative stated, "whatever you placed on the account." Lee stated he would need additional time to answer that question but then responded, "I know that Bexley High School, I'm not sure about the other Kentucky one."  Following this highly suspicious answer, Citibank authorized a wire

transfer of $429,741.11.

46.     On February 20, 2020, a wire transfer of $429,741.11 was made from the Citibank account to "Derek Lee JPMorgan Chase Bank, NA" without Dr. Schottenstein's knowledge, consent or approval.

47.     On February 27, 2020, $249,000 was transferred from the Iberia Account to the Thompson Account without Dr. Schottenstein's knowledge, consent or approval.

48.     On March 20, 2020, $319,057.63, was transferred from the Thompson Account to "Derek Lee JPMorgan Chase Bank, NA" without Dr. Schottenstein's knowledge, consent, or approval.

49.     On August 28, 2020, Lee deposited $100,000 into the Iberia Account without Dr. Schottenstein's knowledge, consent, or approval.

50.     The unauthorized deposits were presumably made to obscure the fact that Lee and Chan drained the Thompson Account of approximately $748,848.

51.     Chan and Lee made all of these wire transfers without Dr. Schottenstein's knowledge, consent or any authority to do so.

**BANK FRAUD – IBERIA AND CHASE ACCOUNTS**

52.     On September 10, 2020, a check from the Iberia Account for $118,000.00 was made out to Dr. Schottenstein. On its face, it appears to be signed by Dr. Schottenstein. However, he has no memory of writing that check and no record of depositing it in any of his accounts.

53.     Upon information and belief, Lee and Chan forged this check, impersonated Dr.

Schottenstein and absconded with the $118,000.00. Upon information and belief, Lee and Chan also gained access to the Medical Practice's bank account at Chase Bank (the "Chase Account"), making numerous unauthorized cash withdrawals from that account both utilizing manual and digital means to do so. These withdrawals totaled in excess of $734,000.

### PATTERN OF RACKETEERING

54.     The funds used to effectuate the fraudulent wire transfers to Lee were procured by shuffling money between Dr. Schottenstein's various personal and business bank accounts without his authorization in an attempt to avoid detection.

55.     In order to conceal the fraud on the Thompson Account, which was used to pay the mortgage on Dr. Schottenstein's residence, Defendants intercepted and/or redirected the monthly mortgage payments.

56.     As a result of Lee and Chan's fraudulent scheme, Dr. Schottenstein was unaware that his townhouse fell into foreclosure.

57.     Lee and Chan, having intercepted Dr. Schottenstein's mortgage payments, concocted another scheme whereby Chan criminally impersonated an attorney of Dr. Schottenstein's via e-mail and engaged in the unauthorized practice of law purporting to help Dr. Schottenstein prevent foreclosure on his townhome.

58.     Chan, under the fraudulent guise of a lawyer named Tracy Pearson (who is an actual attorney) sent multiple emails to Dr. Schottenstein, which were courtesy copied to Chan, falsely telling him and leading him to believe his legal problems, including the townhouse foreclosure, were of no concern and being capably handled by a licensed attorney.

59.     On February 12, 2020, Chan, under the fraudulent guise of Attorney Tracy Pearson, sent Dr. Schottenstein an e-mail including the following statement:  "hi doug, this is tracy, the

8

attorney helping you on a few things, everything is going perfectly and as planned."

60.     On February 14, 2020, Chan, under the fraudulent guise of Attorney Pearson, sent

Dr. Schottenstein an e-mail in response to his concerns about foreclosure stating: "No risk of

losing the house, and I'm wrapping up the two issues you asked [Chan] to have me look into and

deal with yesterday."

61.     On March 26, 2020, Chan, again under the fraudulent guise of Attorney Pearson,

sent Dr. Schottenstein an email with the following language:

> "i spoke to [Chan] and am aware that you received an inaccurate bill from cenlar
> today but please don't worry because it is erroneous since they haven't been in
> charge of the loan for almost a year. i have been in constant communication with
> cenlar and gallo. there is no foreclosure on 168 thompson and cenlar does not
> have the updated information because gallo is in charge of the loan at this time
> and has been for several months. gallo's office is working on this asap so that
> cenlar reflects the appropriate zero balance owed. due to corona outbreak, there's
> been more delays than we anticipated, but there is definitely no foreclosure on
> your townhouse and you do not owe any monies at this time."

62.     On April 21, 2020, Chan again under the guise of Tracey Pearson sent Dr.

Schottenstein an email:

> "I am aware of the cenlar document re: homeowner insurance that states you owe
> cenlar 20k+, this is all inaccurate and another common error cenlar has been
> making, which we have fixed with gallo because he is still in charge of the
> loan/mortgage/property, and it will take time for cenlar to have the accurate
> information reflected"

63.     Dr. Schottenstein reasonably relied on these representations assuming them to be

from an attorney.

64.     In fact, these false representations were created by Chan.

65.     Dr. Schottenstein's townhouse was in foreclosure.

66.     As a result of Dr. Schottenstein's reliance on Chan's fraudulent emails, his

townhouse fell into foreclosure forcing Dr. Schottenstein to expend additional funds to prevent

foreclosure.

67.     Additionally, the fraudulent e-mails from Tracey Pearson prevented Dr. Schottenstein from discovering Chan and Lee's theft of funds from the Thompson Account at an earlier date.

68.     In furtherance of Defendants' racketeering, Defendants also criminally impersonated an accountant for Dr. Schottenstein named "Adam Dussberg" in e-mails advising Dr. Schottenstein that his taxes were in order and that there was "nothing owed".  This, too, was false.

69.     In furtherance of the fraud, Lee and Chan created a fake billing company. Instead of sending the Medical Practices' invoices to an actual billing company who would invoice the patients' insurers and seek reimbursement, Chan created a fake billing company, and represented to Dr. Schottenstein that the invoices were being handled properly, when in fact they were not provided to insurers.

70.     On or about December 2, 2020, to his shock and horror, Dr. Schottenstein determined he was corresponding with a "sock puppet" lawyer and accountant.

71.     Shortly thereafter, Dr. Schottenstein, suspicious but uncertain whether his office manager Chan was behind the scheme, asked Chan to meet with him, whereby he stated his suspicions. Chan had no response.

72.     On or about January 22, 2020, Dr. Schottenstein, who was otherwise in good health, was admitted to the hospital for kidney failure.

73.     In or about April, 2020, Dr. Schottenstein's dog, who was otherwise in good health, also suffered kidney failure as a result of a mysterious drug overdose..

74.     Dr. Schottenstein remained in the hospital until his discharge on January 31, 2020.

75.     After meeting with Chan in late 2020 regarding the false lawyer and accountant

e-mails, Dr. Schottenstein found anti-freeze in his office.  The bottle was open and was missing fluid.

76.     Ingestion of anti-freeze can cause kidney failure.

77.     At this time, Dr. Schottenstein realized there had been an attempt to poison him, and he and confronted Chan.

78.     Chan did not deny her involvement in the criminal conduct and remained silent after Dr. Schottenstein confronted her.

79.     Dr. Schottenstein fired Chan at that time.

80.     In February of 2021, Dr. Schottenstein filed a police report regarding Lee and Chan's criminal conduct.

**AMEX CREDIT CARD FRAUD**

81.     Beginning at least in 2016, Lee and Chan began charging a vast array of their personal expenses totaling hundreds of thousands of dollars to the Medical Practice's American Express account without Dr. Schottenstein's authorization.

82.     On January 7, 2020, Lee and Chan began frequently making unauthorized charges to Dr. Schottenstein's Medical Practice's American Express ("AMEX") card. These unauthorized charges on the American Express credit cards totaled to at least $600,455 in fraudulent charges, including Uber rides, charges for five-star hotel stays and expensive meals.

83.     One aspect of the fraud was using Medical Practice's AMEX business card to rack up charges on a phony Uber account controlled by Chan and Lee.

84.     The AMEX payments to the phony Uber account went to Lee and Chan.

85.     In 2020 alone, these unauthorized charges on the AMEX business card included at least $68,941 in fraudulent charges including Uber rides, charges for five-star hotel stays, and expensive meals.

86.     When Dr. Schottenstein asked Chan why his AMEX business card statements were so high, Chan replied by telling Dr. Schottenstein the charges were fraudulent charges incurred by an unknown party and the "police" were investigating them.

87.     The charges on the AMEX business card were indeed fraudulent but were incurred by Defendants and no police investigation was requested nor did any investigation take place.

## FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(c)
### (Chan and Lee, Defendants)

88.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

I.      **The Applicable Statutes.**

89.     Each Plaintiff is a person as defined in 18 U.S.C. § 1961(3) and 1964(c).

90.     Defendants Lee and Chan are persons as defined in 18 U.S.C.§ 1961(3) and 1964(c).

91.     Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt." And, under 18 U.S.C. § 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions, including section 1962(c).

92.     Federal RICO, specifically 18 U.S.C. § 1964(c), creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained upon recovery and for the cost of suit including reasonable attorney fees.

II.     **The Enterprise.**

**Legal Entity Enterprise**

93.     The Enterprise is Schottenstein Pain & Neuro, PLLC, a legal entity as defined in 18 U.S.C. § 1961(4).  Defendants Lee and Chan were employed for this legal entity for a number of years, Chan as Office Manager and Lee as a medical assistant, and thus conducted and managed the affairs of the entity. The activities of the Enterprise affected interstate commerce as it provided services to clients, who are located in other states and is a business which used goods and services which travel in interstate commerce. Although Lee's employment for the entity had been terminated prior to the wire frauds occurring during the year 2020, he remained on the payroll (since Chan did not delete him therefrom), had participated for years in the AMEX access device fraud, directly participated in the wire frauds by impersonating Dr. Schottenstein in order to effect same, and continued to conspire with Chan regarding all racketeering activities.

**Association in Fact Enterprise**

94.     The Enterprise is alternatively an association in fact consisting of Lee and Chan and any other persons not yet known which associated with them. Lee and Chan functioned for the purpose of defrauding Plaintiffs and enriching the alternative Enterprise's members and associates.  The purpose of the alternative Enterprise was to defraud Plaintiffs of monies and properties through wire fraud, mail fraud, identification fraud, the impersonation of an attorney and others, check fraud and other fraudulent activity in connection with access devices (AMEX Fraud and the unauthorized withdrawal of funds from Plaintiffs' acounts).  The monies obtained by these various schemes were used for Defendants' personal enrichment.

95.     Lee and Chan conducted the affairs of the Enterprise. The Enterprise, an association in fact between Lee, Chan, and others yet unknown, operated as an ongoing organization separate and distinct from each individual Defendant.  The Enterprise, an association in fact of individuals, has a structure separate and apart from the pattern of

racketeering activity in which Defendants engage.

96.     At all times relevant to this Complaint, Lee and Chan, members and associates of the Enterprise, an association in fact enterprise, functioned together as a continuing unit, with a common purpose for their own economic benefit and personal gain.  Lee and Chan each participated in the management and operation of the Enterprise, as further described below. The Enterprise had longevity sufficient to permit the RICO Defendants to pursue the Enterprise's purpose.

97.     The activities of the association in fact Enterprise also affected interstate commerce as it provided services to clients, who are located in other states and is a business which used goods and services which travel in interstate commerce.  The Enterprise also affected interstate commerce based on Defendants' unlawfully obtaining, transmitting, billing and collecting monies through use of interstate wirings and access device fraud, in furtherance of the racketeering scheme as alleged in this Complaint.

**The Racketeering Violations**

98.     From in or about the year 2016, and continuing up through the year 2020, the RICO Defendants, persons associated with or employed by the Enterprise, did knowingly and unlawfully conduct, or participate, directly or indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

**Racketeering Activity -Definition of Crimes**

99.     Over the course of approximately four (4) years, Defendants have engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of RICO and also within 10 years of each individual act. Defendants' actions violated the federal wire fraud statutes 18 U.S.C. § 1343; 18 U.S.C. § 1029(a)(5) (knowingly

and with intent to defraud effects transaction with one or more access devices issued to another

person); 18 U.S.C. § 1028(a)(7) use of identification of another person with intent to commit unlawful

activity which constitutes a felony;  and attempted murder in violation of New York state law 125.25

(murder in the second degree), all predicate acts for purposes of racketeering, resulting in the defrauding

of Plaintiffs in excess of $3.6 million dollars.

100.    <u>Wire Fraud in violation of 18 U.S.C. § 1343</u> provides: Whoever, having devised or

intending to devise any scheme or artifice to defraud, or for obtaining money or property by

means of false or fraudulent pretenses, representations, or promises, transmits or causes to be

transmitted by means of wire, radio, or television communication in interstate or foreign

commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such

scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

**Fraud in Connection With Access Devices**

101.    Section 1029(a)(2) of 18 U.S.C. makes it unlawful to "knowingly and with intent

to defraud [,] traffic[ ] in or use [ ] one or more unauthorized access devices during any one-year

period, and by such conduct obtain [ ] anything of value aggregating $1,000 or more during that

period." The term "access device" includes credit cards, *see* 18 U.S.C. § 1029(e)(1), and an

"unauthorized access device" is defined as "any access device that is lost, stolen, expired,

revoked, canceled, *or obtained with intent to defraud," Id* at*.* § 1029(e)(3) (emphasis added).

Section 1029(a)(5) punishes a person who knowingly and with intent to defraud effects

transactions with one or more access devices issued to another person.

102.    <u>Knowing Use Without Lawful Authority of Means of Identification of Another</u>
<u>person With Intent to Commit a Felony</u>- 18 U.S.C. § 1028(a)(7 ) prohibits the following activities:

knowingly transfers, possesses, or uses, without lawful authority, a means of identification of

another person with the intent to commit, or to aid or abet, or in connection with, any unlawful

activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable state or local law.

103.   <u>Attempt to commit Murder in the Second Degree- NYS section 125.25</u> - A person is guilty of murder in the second degree when: "With intent to cause the death of another person, he causes the death of such person or of a third person."  Attempted murder in violation of New York state law is a predicate under 18 U.S.C. 1961(1)(A), an act or threat involving murder.

**Predicate Acts**

- <u>Wire Fraud</u> - In furtherance of their schemes to defraud, and with the purpose of executing his scheme to defraud, Lee and Chan herein, made intentional misrepresentations and omissions which include, but are not limited to, the following:

104.   On February 20, 2020, Lee and Chan, working together, caused a wire transfer of $429,741.11 from the Thompson Account to "Derek Lee JP Morgan Chase Bank N.A." without Dr. Schottenstein's knowledge, consent or approval.

105.   On February 27, 2020, Lee and Chan, working together, caused a wire transfer of $249,000 from the Iberia Account to the Thompson account (controlled by Defendant) without Dr. Schottenstein's knowledge, consent or approval.

106.   On March 20, 2020, Lee and Chan, working together, caused a wire transfer of $319,057.63. from the Thompson Account to "Derek Lee JP Morgan Chase Bank N.A." without Dr. Schottenstein's knowledge, consent or approval.

107.   On April 23, 2020, Lee and Chan, working together, caused a wire transfer of $249,000 from the Thompson Account to the Iberia Account without Dr. Schottenstein's knowledge, consent or approval.

108.   These unauthorized deposits and withdrawals were to obscure the fact that Lee and Chan had drained the Thompson Account of approximately $748,848, payable to Lee, without Dr. Schottenstein's knowledge, consent or approval.

109.   Defendants Lee and Chan also forged a check in the amount of $118,000 from the Iberia Account made out to Dr. Schottenstein, which monies were used by Lee and Chan.

- <u>Identification Fraud, Section 1028(a)(7)</u> (using the means of another person with intent to commit or aid and abet any unlawful activity in violation of federal law, e.g., wire fraud).

110.   As set forth above, Lee repeatedly impersonated Dr. Schottenstein on calls with Citibank in order to effect the wire transfers.

111.   Defendants, having intercepted Dr. Schottenstein's mortgage payments, concocted another scheme whereby Chan criminally impersonated an attorney via email and engaged in the unauthorized practice of law purporting to help Dr. Schottenstein prevent foreclosure.  Chan, under the fraudulent guise of a lawyer named Tracy Pearson (who is a real attorney) sent multiple emails to Dr. Schottenstein (which were cc'd to Chan) falsely telling him and leading him to believe his legal problems, including the foreclosure, were of no concern and being capably handled.

112.   From February 2020 to March of 2020, Chan sent e-mails, which are wires in interstate commerce and thus the e-mails were section 1343 predicate activity to Dr. Schottenstein which were materially false.

113.   In furtherance of Defendants' racketeering, Defendants also criminally impersonated an accountant for Dr. Schottenstein named "Adam Dussberg" in emails advising Dr. Schottenstein that his taxes were in order and that there was "nothing owed".  This, too, was false, and constitutes both a violation of section 1028(a)(7), and the e-mail wire fraud in

violation of section 1343.  Defendants Chan and/or Lee impersonated other persons,

created fake vendors and sham entities to steal money from Plaintiffs and/or to conceal such

activity by means of  deception.

- Attempted Murder in Violation of New York State Law

114.    As previously described, Chan caused Dr. Schottenstein (and his dog) to fall ill

with kidney problems, which in the case of Dr. Schottenstein was suspected to be poisoning by

anti-freeze, and in the case of his dog was suspected to be poisoning by a mysterious drug, which

when confronted by Dr. Schottenstein with these actions, Chan did not deny her involvement.

- Fraud In Connection with Illegal Use of Plaintiffs' Access Device (AMEX Credit
  Card Fraud) - Section 1029(a)(2) and/or (a)(7).

115.    As described previously, beginning at or around October 2016, and continuing

through December 2020, Lee and Chan charged a wide variety of expenses to Plaintiffs' AMEX

account without authorization.  As part of this fraud, Defendants set up phony Uber accounts and

began charging the Medical Practice's AMEX business card to these Uber accounts when in fact

Lee and Chan were receiving the payments.

116.    These unauthorized charges on the AMEX business card totaled in excess of

$600,000 in fraudulent charges, including charges for Uber rides, stays at five-star hotels and

meals at expensive restaurants.  When Dr. Schottenstein asked Chan why his AMEX business

card statements were so high, Chan replied by telling Dr. Schottenstein the charges were

fraudulent charges incurred by an unknown party and that the "police" were investigating.  Dr.

Schottenstein relied on these false claims that the fraudulent charges were being investigated,

and as a result did not take further action until 2021 causing him additional financial injury.

**Continuing Pattern of Racketeering Activity**

117.    Plaintiffs allege that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of defrauding Plaintiffs of millions of dollars, all for the personal enrichment of the Defendants.

118.    Plaintiffs alleges that the continuity of the pattern of racketeering activity constitutes closed-ended continuity as there were a substantial number of violative activities, connected through multiple schemes, which occurred on a continuous basis over a substantial period of time, *i.e.*, from about October 2016 through December 2020.

119.    Plaintiffs allege that the pattern of racketeering activity is shown by the threat of continued activity as Defendants engaged in such serious violations as attempted murder to cover their frauds and thus Lee and Chan remain a threat to others and their racketeering activity meets the open-ended continuity test.

**Injury**

120.    As a direct and proximate result of the Defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property as set forth more fully above.

121.    As a result, Plaintiffs are damaged in an amount in excess of $3.6 million to be determined at trial.

### SECOND CAUSE OF ACTION
### (Federal Civil RICO Conspiracy – 18 U.S.C. § 1962(d))
### Against Defendants Lee and Chan

122.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

**The Conspiracy Violation**

123.    Plaintiffs allege that commencing in or about late 2016 or early 2017, the RICO Defendants described above conspired to violate section 1962(c), i.e., each agreed that a co-conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of acts indictable under 18 U.S.C. §§ 1343, 18 U.S.C. § 1028(a)(7); 1029(a)(2) and (a)(7); and attempted murder, as more fully described in the First Cause of Action. Plaintiffs allege that the conspiratorial objective of that mutual agreement was intended to obtain Plaintiffs' interests in business and/or property, and that such conspiratorial conduct violates RICO §1962(d).

124.    Each RICO Conspiracy Defendant intended to further the schemes to defraud and commit crimes, which as described in First Cause of Action were completed and satisfied by the acts of at least one substantive individual Defendant. As demonstrated in detail above, Chan and Lee have engaged in numerous predicate racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud Plaintiffs of money and other property interests.

125.    The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that each Defendant not only agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but was aware that his ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

126.    As a result, Plaintiffs are damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Fraud)

127.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

128.    Chan's fraudulent statements to Plaintiffs hid Chan and Lee's theft of funds from the Thompson Account and the AMEX account and kept Dr. Schottenstein from discovering the theft earlier.

129.    In addition, Chan and Lee intentionally and knowingly pretended to be an attorney and falsely represented to Dr. Schottenstein that his townhouse was not in foreclosure.

130.    Dr. Schottenstein reasonably relied on those representations.

131.    As a direct result of those representations, Dr. Schottenstein was the victim of multiple large wire transfers and his townhouse fell into foreclosure, forcing him to expend additional funds to remove the townhouse from foreclosure proceedings.

132.    As a result of Chan and Lee's fraud, Plaintiffs are damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Conversion)

133.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

134.    Dr. Schottenstein through Plaintiff Thompson Real Estate, LLC is the exclusive owner of the Thompson Account and, individually, is the exclusive owner of the Iberia Account.

135.    Lee and Chan interfered with Dr. Schottenstein's exclusive ownership of the Thompson Account and Iberia Account and his right to possession of the funds therein when

they, having stolen his identity, gained access to those accounts, and made various transfers

including transfers to an account controlled by Chan and Lee totaling approximately

$748,848 in funds stolen from Dr. Schottenstein.

136.     Upon information and belief, Lee and Chan forged a check, impersonated Dr.

Schottenstein and absconded with $118,000.00.

137.     In addition, Lee and Chan interfered with Dr. Schottenstein's exclusive right

to control the Medical Practice's AMEX card and used it for the purpose of purchasing over

$600,000 in personal goods and services.

138.      As a result of Defendants' conversion, Plaintiffs are damaged in an amount to be

determined at trial.

## FIFTH CAUSE OF ACTON
### (Tortious Interference with Contract)

139.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs

and incorporate them with the same force and effect as if set forth specifically herein.

140.     Dr. Schottenstein had a valid contract for the mortgage on his townhouse residence.

141.     Lee and Chan knew Dr. Schottenstein had a mortgage on his residence.

142.     Lee and Chan conspired to interfere with that contract by diverting Dr.

Schottenstein's mortgage payments causing Dr. Schottenstein to breach his mortgage agreement.

143.     As a result of Dr. Schottenstein's breach, he has had to pay additional funds to

remove his town house from foreclosure.

144.     As a result of Defendants' interference, plaintiffs are damaged in an amount to be

determined at trial.

## SIXTH CAUSE OF ACTION
### (Battery)

145.    Dr. Schottenstein repeats and realleged the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

146.    Chan contaminated Dr. Schottenstein's food or drink with antifreeze with the intent to kill or cause severe bodily harm to him.

147.    As a result of Chan's action, Dr. Schottenstein ingested the poisoned food or drink and became seriously ill with kidney failure requiring dialysis and a two week stay in the hospital.

148.    As a result of Defendants' battery, Dr. Schottenstein is damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Conspiracy to Commit Fraud)

149.    Plaintiffs repeat and realleged the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

150.    Upon information and belief, Lee and Chan conspired together to engage in the fraud described above by taking the foregoing actions and using a sock puppet lawyer and sock puppet accountant to fool Dr. Schottenstein into believing his townhouse was not in foreclosure.

151.    Upon information and belief, Lee and Chan engaged in this conspiracy to commit fraud for the purpose of hiding their theft of not less than $3.6 million.

152.    As a result of Defendants' conversion, Plaintiffs are damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Conspiracy to Commit a Tort)

153.    Plaintiffs repeat and realleges the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

154.    Upon information and belief, Lee and Chan conspired to engage in a scheme to steal not less than $3.6 million dollars from Dr. Schottenstein.

155.    In furtherance of that scheme Lee and Chan conspired to hide their theft from Dr. Schottenstein by inventing a sock puppet lawyer and accountant to deceive Dr. Schottenstein into believing his townhouse was not going into foreclosure so that he would not notice the significant drawdowns in the Thompson Account.

156.    Lee and Chan conspired to take control of the Medical Practice's AMEX and charge in excess of $600,000 in unauthorized purchases for which Dr. Schottenstein is liable.

157.    Lee and Chan conspired to impersonate Dr. Schottenstein during calls with Citibank representatives in order to authorize fraudulent wire transfers.

158.    Finally, upon information and belief, Lee and Chan conspired to kill or cause severe bodily harm to Dr. Schottenstein to conceal their theft.

159.    As a result of Lee and Chan's conversion, Plaintiffs are damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

160.    Dr. Schottenstein repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

161.    Lee and Chan's conduct in stealing not less than $748,848 from the Thompson

Account and not less than $600,000 in unauthorized AMEX charges, diverting his mortgage payments causing his town house to fall into foreclosure, creating a fake billing company, deceiving Dr. Schottenstein about the status of his mortgage and the state of his financial situation, and poisoning both Dr. Schottenstein and his dog constitutes extreme and outrageous conduct.

162.    Defendants engaged in this conduct either with the intent to or in disregard of the substantial possibility of causing Dr. Schottenstein emotional distress.

163.    Dr. Schottenstein has endured emotional distress as a direct result of Chan and Lee's actions.

164.    As a result of Chan and Lee's Intentional Infliction of Emotional Distress, Dr. Schottenstein is damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Faithless Employee Claim)

165.    Plaintiffs repeat and reallege the statements contained in the above paragraphs and incorporate them herein with the same force and effect as if set forth at length.

166.    Plaintiffs are the victims of Defendants' willful acts constituting violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section 1962 *et seq*., fraud, conversion, tortious interference with contract, battery, conspiracies to commit fraud and tort, and intentional infliction of emotional distress.

167.    In late 2016, Plaintiff Douglas Schottenstein, M.D. advised Defendant Chan that she would be promoted to the position of office manager for Plaintiff Schottenstein Pain and Neuro, PLLC (the "Medical Practice") as Cara Camden, the then-current office manager, prepared to leave that position.

168.    Sometime later, in early 2017, Plaintiffs hired Defendant Lee as a medical assistant.

169.    Shortly thereafter, in 2017, Chan and Lee in concert with each other began charging their personal expenses to American Express cards on the company account for the Medical Practice without the authorization or consent of Dr. Schottenstein.

170.    These cards had been provided to them for the sole purpose of performing their respective responsibilities as employees to obtain supplies for the Medical Practice and to enable the day to day business needs of the office to be met without requiring Dr. Schottenstein to supervise every detail.

171.    These unauthorized American Express card abuses were followed by an organized campaign implemented by Chan and Lee from mid-2017 through late 2020 to embezzle, misappropriate and steal millions of dollars from Plaintiffs by means of bank fraud, wire fraud, unauthorized withdrawals (both manual and electronic), identity theft and credit card fraud.

172.    Moreover, although Lee was terminated by Plaintiffs in or about mid-2019, and no later than July 1, 2019, Chan left Lee on the Medical Practice payroll enabling him to continue to receive salary checks that were wholly unearned and costing the Medical Practice additional dollars in Social Security contributions and Medicare tax.

173.    Based upon the foregoing continuing acts of Chan and Lee over the approximate three-year period at issue, and the tracing of the stolen funds into the bank accounts of Chan and Lee, these Defendants breached their duty of loyalty and trust as employees and further exhibited misconduct and unfaithfulness in their employment service to Plaintiffs.

174.    As a result, Plaintiffs further claim faithless employee damages consisting of the $1.255 million in salary and bonuses paid to these Defendants from mid-2017 through November, 2020 together with additional bonus payments..

175.    During this period, these Defendants caused Plaintiffs to incur compensatory damages in excess of $3,634,285.

**Wire Fraud Pertaining to the Thompson Real Estate, LLC Account**

176.    In late 2016, Dr. Schottenstein opened a checking account for Thompson Real Estate, LLC at Citibank (the "Thompson Account") with the intention of using this account for the sole purpose of making  monthly mortgage payments for his residence. [D.E. 82-2 and 3: E-Mails dated November 25 and 26, 2016 and January 11, 2017 (DS-LEE 00056-00058 and 00224-00225)].

177.    One of Chan's responsibilities as office manager was to make the monthly mortgage payment from the Thompson Account. [D.E. 82-3: E-Mail dated January 24, 2017 (DS-LEE 00225-00225)].

178.    Two unauthorized wire transfers totaling $748,798 were initiated and withdrawn by Chan and Lee from the Thompson Account at Citibank, and the proceeds of both were subsequently deposited into an account owned by Lee in JP Morgan Chase Bank ("Chase").

179.    The first such withdrawal in the amount of  $429,741 occurred on February 20, 2020, and the second withdrawal of $319,057 occurred on March 20, 2020. [D.E. 84-2: Balla Economic Damages Report at p. 13 and Report Exhibit 1 and Appendix H and Report Exhibit 2 and Appendix I.]. In addition, on August 28, 2020, Lee deposited $100,000 into Dr. Schottenstein's Account at Iberia Bank without authorization to do so. This deposit was intended to conceal Chan and Lee's wrongful activities.

180.    The withdrawals of both wires from the Thompson Account and their subsequent deposits into Lee's Chase account on February 20, 2020 and March 20, 2020 have been traced together with subsequent transfers of these funds by Lee into two other Chase accounts that he owns. [D.E. 84-2: Balla, Economic Damages Report at p. 13 and Report Exhibit 1 and Appendix H and Report Exhibit 2 and Appendix I.]. In order to conceal the wire fraud in the Thompson Account, Defendants intercepted snd redirected monthly mortgage payments which as a result remained unpaid ultimately causing the residence to fall into foreclosure. Defendants then criminally impersonated

Tracy Pearson, Esq., an attorney known to Dr. Schottenstein, to provide false written assurances that the mortgage loan account was current.

181.    Chan and Lee have formally admitted in writing that they caused and facilitated the $429,741 wire from the Thompson Account on February 20, 2020 and the $319,057 wire from the Thompson Account on March 20, 2020. [D.E. 82-9: Defendants Chan and Lee's Responses to Plaintiffs' First Set of Discovery Demands, Part I: Requests for Admissions, ## 33, 34, 35, 36, 41, and 43].

**Unauthorized American Express Charges Not Substantiated for Business Purposes**

182.    Dr. Schottenstein opened American Express cards under the Medical Practices company account for both Chan and Lee to be used by them for purposes related to the Medical Practice.

183.    Commencing in 2017, Chan and Lee used the American Express cards assigned to each of them for unauthorized personal expenses that could not be substantiated for a business purpose. During the years, 2017 through 2019, Lee's unauthorized American Express charges totaled $399,907 and Chan's unauthorized American Express charges totaled $200,547 for total unauthorized American Express charges of $600,455 during this period. [D.E. 84-3 and 4: Balla, Economic Damages Report at p. 13, and Report  Exhibits 3, 4 and Appendix J.]

**Unauthorized Cash Withdrawals**

184.    During the years 2017 through 2019, Chan made numerous unauthorized cash withdrawals from the Medical Practice's Account at Chase totaling $528,283. [D.E. 84-5 and 6: Balla, Economic Damages Report at p. 14, and Report Exhibit 5 and Appendix K.]

**Unauthorized Transfer Using Chase QuickPay and QuickPay with Zelle**

185.    Unauthorized transfers were made from the Medical Practice's Account at Chase to Chan and Lee's's accounts via Chase QuickPay and QuickPay with Zelle during the years 2017-2019. These transfers were made without the authorization or knowledge of Dr. Schottenstein.

186.     Chan received a total of $12,400 in these transfers during this period. Both the withdrawals from the Medical Practice's Account at Chase and the deposits into the Chan account at Bank of America ("BOA") have been traced. [D.E. 84-7 through 9: Balla, Economic Damages Report at p.14, and Report Exhibits 6, 7 and Appendices L and M.]

187.     During 2017 and 2018 Lee received a total of $193,831 in Chase QuickPay and QuickPay with Zelle unauthorized cash transfers from the Medical Practice's Account at Chase. The deposits of these funds into three separate accounts owned by Lee at Chase have been traced. [D.E. 84-7 through 9: Economic Damages Report at p. 14, and Report Exhibits 6, 7 and Appendices L and M].D.E. 84-2 and 9

**Post-Termination Payroll Costs Incurred for Lee**

188.     In early 2019, Lee was terminated from his position at the Medical Practice. Nevertheless, without advising Dr. Schottenstein, Chan abused her position as office manager by keeping Lee on payroll thereby enabling him to continue to collect paychecks for unearned salary amounts until he was effectively removed from the payroll system as of November 1, 2020. After confirming the gross wages received by Lee during 2019 and 2020 and using July 1, 2019 as the termination date for Lee's employment by the Medical Practice, the prorated wage amounts for 2019 and 2020 were used to calculate the portions of Social Security and Medicare tax paid by the Medical Practice for the same period. These calculations resulted in $97,796 of costs incurred by the Medical Practice in 2019 and $79,357 of costs incurred by the Medical Practice in 2020, or $177,153 in total, paid on behalf of Lee during the period July 1, 2019 through October 30, 2020. [D.E. 84-2 and 9: Balla, Economic Damages Report at p. 15, and Report Appendix N.

**Forged Check Drawn on the Schottenstein Iberia Bank Account**

189.     Dr. Schottenstein established an Account that he solely owns at Iberia Bank. Dr. Schottenstein has confirmed that his signature was forged on a $118,000 check that was withdrawn

from the Schottenstein Iberia Account. This check was not deposited in any account owned by Dr. Schottenstein. The only persons other than Dr. Schottenstein that had access to this Iberia Account were Chan and, through Chan, Lee. The September 2020 bank statement for this Iberia Account documents the cancelled check and its withdrawal from this Iberia Account. Chan and Lee admit that they absconded with $118,000 by cashing this check. [D.E. 84-2 and 11: Balla, Economic Damages Report at p. 16, and Report Appendix P.].

190.     Dr. Schottenstein confirms that none of the foregoing transfers, payments and charges were authorized or consented to by him and were in each instance improperly taken by Chan and Lee. Schottenstein

**Faithless Employee Damages for Unauthorized Taking of Funds by Chan and Lee**

191.     The Economic Damages Report and the analysis and review of the documents discussed therein and attached to the Report as Exhibits and Appendices delineated above identify and confirm numerous bank transfers between the Medical Practice Account and Thompson Account and those accounts in the name of Chan and Lee, which were not for the business expenses of either the Medical Practice or Thompson Real Estate, LLC. In addition, the supporting documentation reviewed evidences the receipt of various wire transfers and payments into the bank accounts of Chan and Lee. Based on these actions as supported by the tracing of bank documents for the unauthorized wires, forged check, withdrawals and credit card charges, constituting the continued taking of unauthorized funds as employees, conducted by Chan and Lee, these defendants have breached their duty of loyalty and trust as employees and have further exhibited misconduct and unfaithfulness in their employee service.

192.     Faithless Employee Damages arising from compensation paid to Chan and Lee during the period of their embezzlement from years 2017 through June 30, 2019 (Lee) and September 20, 2020 (Chan) are calculated to be at least $1,255,499. [D.E. 84-2, 9 and 10: Economic Damages

Report at p. 17 and Report Exhibit 8 and Appendices N and O.].

193.     Total Damages incurred by Plaintiffs through December 31, 2020 are at least $3,634,285 and are summarized as follows:

1.   Unauthorized Wire Transfers …………………..…………… $748,798

2.   American Express Charges Without Business Purpose ………$600,455

3.   Unauthorized Cash Withdrawals by Chan ……………………$528,283

4.   Unauthorized Chase QuickPay and Zelle Transfers …………. $206,231

5.   Post-Termination Payroll Costs for Lee ……………………… $177,018

6.   Forged Check Drawn From Iberia Account …………………... $118,000

7.   Faithless Employee Damages ……………………………… $1,255,499

     TOTAL ……………………………………………………… $3,634,285

[D.E. 84-2: Balla, Economic Damages Report at p.17.].

194.     Chan and Lee converted Plaintiffs' assets in seven (7) categories of Plaintiffs' property: (1) the unauthorized wires that transferred $748,798 out of the Thompson Account and into their own respective accounts, (2) the unauthorized American Express card charges totaling in excess of $600,000 for abusive, lavish and outlandish expenditures having absolutely nothing to do with the business purposes for which the cards were provided, (3) the unauthorized manual cash withdrawals from the Medical Practice Account exceeding $528,000, (4) the electronic cash withdrawals from the Medical Practice Account via Chase QuickPay and QuickPay with Zelle that exceeded $206,000, (5) post-termination payroll costs for Lee resulting from wrongly failing to delete him from the system thereby depriving the Medical Practice of over $177,000 in unnecessary costs, (6) defendants' forgery and absconding with a $118,000 check made out to Dr. Schottenstein that cleared the Iberia Bank Account without the proceeds being deposited into any account owned or controlled by Plaintiffs, and (7) over $1.255 million in unearned salary and bonuses collected by defendants while

they targeted and continued to target the theft of Plaintiffs' assets through bank fraud, wire fraud, identity theft, credit card fraud and manual and electronic withdrawals.

195.     In or about December, 2020, Chan installed Refog and Remote PC on Dr. Schottenstein's computer without his permission or knowledge. Refog enabled Chan to log onto the computer remotely while Refog enabled her to recapture and monitor the keystrokes entered by Dr. Schottenstein.

196.     New York's common-law faithless servant doctrine provides that an agent or employee that breaches its fiduciary duty of loyalty to its principal/employer forfeits its right to compensation for the period of its disloyalty. [*Supreme Showroom, Inc. v. Branded Apparel Group, LLC*, 2018 U.S. Dist. LEXIS 107902*; 2018 WL 3148357 (S.D.N.Y. 2018).].

197.     An agent is obligated "to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" [*Western Elec. Co. v. Brenner, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 360 N.E.2d 1091 (1977)* (quoting *Lamdin v. Broadway Surface Adver. Corp., 272 N.Y. 133, 138, 5 N.E.2d 66 (1936))*.].

198.     "One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary. ["*Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977)* (citing *Restatement (Second) of Agency* (1958), § 469).]. Moreover, a "principal is entitled to recover from his unfaithful agent any commission paid by the principal." [*Wechsler v. Bowman, 285 N.Y. 284, 292, 34 N.E.2d 322 (1941); see also Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d 81, 474 N.Y.S.2d 281, 287 (1st Dep't 1984)* (employer is entitled to the return of compensation paid employee during period of disloyalty)]. It does not "make any difference that the services were beneficial to the principal, or that the principal suffered no provable

damage as a result of the breach of fidelity by the agent." *Feiger*, 41 N.Y.2d at 928-29.]

*See, also*, *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)

199.    The conduct of Defendants during the nearly four-year period in which they engaged in the aforesaid seven (7) categories of misconduct and disloyalty not only speaks for itself, but most definitely satisfies the misconduct, breach of loyalty and faithlessness standard required to implement the faithless servant doctrine.

200.    Defendants' conduct was not only outrageously disloyal, but resulted in the extreme financial detriment of Plaintiffs. Consequently, Plaintiffs are entitled to reclaim the more than $1.255 million in salary and bonus compensation  paid to Defendants during this period at issue.

**WHEREFORE,**  Plaintiffs Dr. Douglas Schottenstein, M.D., Thompson Real Estate, LLC. And Schottenstein Pain and Neuro, PLLC d/b/a MY Spine Medicine seek judgment in their avor and against Defendants as follows:

A.  Awarding Plaintiffs actual damages, treble damages, statutory damages, punitive damages, costs and reasonable attorneys' fees;

B.  Interest calculated from the dates of the transfers; and

C.  Such other and further relief as may be necessary, just and proper.

THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to *Federal Rule of Civil Procedure* 38, Plaintiffs demand a trial by jury as to all issues so triable.

/s/ *Corey H. Morris, JD, MA.*
CORY H. MORRIS, JD, MA (CM5225)
Cory H. Morris, P.C.
863 Islip Avenue
Central Islip, New York  11722
(631) 450-2515
*Co-Counsel for Plaintiffs*

/s/ *Jeffrey A. Donner, Esq.*
JEFFREY A. DONNER, ESQ. (JD6562)
DONNER LAW
708 Highway 35 South, 2nd Floor
Neptune, New Jersey 07753
(732) 578-8530
*Co-Counsel for Plaintiffs*

/s/Richard Bruce Rosenthal, Esq.
RICHARD BRUCE ROSENTHAL, ESQ. (RB1834)
545 E. Jericho Turnpike
Huntington Station, New York  11746
(631) 629-8111
*Co-Counsel for Plaintiffs*

Dated:  February 9, 2024